[No. F053355. Fifth Dist. Dec. 30, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
SUZE ADAMS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A and C of the Discussion.

1010

## COUNSEL

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Julie A. Hokans, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

ARDAIZ, P. J.—

## INTRODUCTION

Suze Adams appeals from a sentence of life without possibility of parole for the premeditated murder of Kristina Soult by means of arson. She contends that the trial court erred in admitting certain statements that she made when she took a polygraph examination. She also contends that her convictions for attempted premeditated murders of three other people who were at the site of the arson fire should be vacated because she did not know that they were present. Finally, she contends that the trial court erred in ordering direct restitution to the Turlock Fire Department. In the published portion of this opinion, we reject Adams's contention that her attempted murder convictions should be vacated. In the nonpublished portion of the opinion, we reject her contention that her confession should not be admitted but we agree that direct restitution to the Turlock Fire Department was erroneous. Thus, we will remand for resentencing.

## STATEMENT OF THE CASE

On August 31, 2006, Adams was charged in a six-count information with committing five crimes on or about June 18, 2004, as follows: count 1, the murder of Kristina Soult (Pen. Code, § 187), with an allegation that the crime was premeditated and a special circumstance allegation that it was committed while Adams was engaged in the commission of arson (Pen. Code, § 190.2, subd. (a)(1)); count 2, arson of an inhabited structure or property (Pen. Code, § 451, subd. (b)); and counts 3, 4, and 5, the attempted murders (Pen. Code, §§ 664, 187) of Joseph Lopes, J.V., and Andrea Marr, respectively, with allegations that the crimes were premeditated. Adams was charged in count 6 with committing an additional arson of an inhabited structure or property on or about March 25, 2004.

On September 19, 2006, Adams pled not guilty and not guilty by reason of insanity to the charges.

On February 1, 2007, Adams filed a motion to exclude statements that she gave on August 4, 2004, while taking a polygraph examination. On April 4, 2007, the prosecutor filed an opposition to the motion. On April 6, 2007, the court conducted an Evidence Code section 402 hearing, heard argument, and denied the motion. On May 14, 2007, the court revised its ruling and excluded Adams's statements regarding "certain evidence of controlled substances."

On May 14, 2007, Adams withdrew her plea of not guilty by reason of insanity. On May 29, 2007, a jury found Adams guilty as charged in all six counts, found the murder and attempted murders to have been premeditated, and found the special circumstance allegation to be true.

On July 10, 2007, the court sentenced Adams to state prison on count 1 and the special circumstance for life without possibility of parole. The court imposed a middle term of five years for both count 2 and count 6, but stayed punishment of count 2, sentenced Adams for counts 3, 4, and 5 to life with the possibility of parole, ordering those counts to run concurrent with each other but consecutive to count 6, and ordered Adams to pay direct restitution to the Turlock Fire Department in the amount of $9,309.19.

On July 17, 2007, Adams filed a notice of appeal.

## FACTS

*Prosecutor's Case*

### A. The Fires

On March 25, 2004, Jerry McDaniel, the fire marshal for the City of Turlock, was dispatched to the scene of a fire. The fire was already out, and McDaniel spoke with the fireman in charge, Captain Becker. McDaniel and Becker determined that the fire originated from the wooden front porch of the house and extended "up and out" in a classic "V-pattern," charring the front porch and front wall of the house. McDaniel originally concluded that the cause of this fire was "undetermined" because "cigarette butts in the area" could have accidentally ignited the fire.

On June 18, 2004, McDaniel was dispatched to the same house, again meeting with Becker, who related that a young man at the scene had advised that his mother was still inside the home. McDaniel did a "brief walk around" and "clearly" saw "there were two separate fires set" at the house, one at the backdoor and one on the front porch. Both fires grew "up and out," extending into the house until intersecting, consuming much of the house and causing the front porch, the roof, and "all the floorboards" in the house to collapse. The reason that the second fire was "much more intense" than the first was a heavier "fuel content" or "fuel package" on the front porch, in that a large stuffed chair or recliner caught fire. The fire at the backdoor started where "[i]gnitable fluid was poured." The body of the young man's mother was found in the bathroom.

Found in some trash cans in the area were two "one gallon Ziplock seal-a-meal type bags" containing what looked like pine needles. The bags

emitted an "odor of a cleaning fluid or paint thinner." Samples of the contents of these bags were sent to the Department of Justice for analysis, and the samples were determined to be "rosemary and alcohol."

McDaniel concluded that both the March 25 and June 18 fires were the result of arson.

## B. The Victims and the Suspect

Witness interviews showed that the deceased female, Kristina Soult, was in the home at the time both fires were started. Present at the time of the first fire were Soult, Joseph Lopes, and Lopes's girlfriend. They managed to escape through the back door of the house. Present for the second fire were Lopes, Andrea Marr, who was Soult's friend, and J.V, who was Soult's grandson and Lopes's nephew.

During the second fire, Lopes stated that he was asleep on a couch when he was awakened "by heat and light coming through the front window." He got up, woke up everyone else in the house, and tried to get them out. He last saw his mother in the hallway, when she handed J.V. to Andrea. He, Andrea, and J.V. exited the house through the backdoor, which was "already hot to the touch." Upon opening the door, the "fire rolled in on the floor making it difficult to get out." After exiting the house, he realized his mother was still inside.

Turlock Police Detective Morgan attended Soult's autopsy on June 18, 2004. Later that day, he got an anonymous telephone call from a woman subsequently determined to be the wife of David Jaen. The next day, he got an anonymous telephone call from a man who was subsequently determined to be Jaen. He met with Jaen and, as a result, came to consider Adams a suspect in Soult's death.

Both Jaen and Adams were cooks who worked at the same restaurant in Turlock. Jaen also had worked with Soult around 2002 or 2003, in another restaurant. According to Jaen, Adams never told him that she was scared of Soult. Shortly after the first fire at Soult's house, Jaen learned about it from Soult's son, Joseph Lopes. He mentioned to Adams that someone had tried to burn Soult's home, and she responded that the "[s]econd time around she'll do better." About a week before the second fire, Soult came into the restaurant and ate, which made Adams "furious." After the second fire, Jaen immediately suspected Adams because of her statements about the first fire.

Detective Morgan determined that the distance between Adams's and Soult's homes was about "a mile and a half." On June 20, 2004, he searched

Adams's residence pursuant to a search warrant and found "numerous rosemary needles throughout" the home. He interviewed Adams on June 20, 2004. Adams told him that Soult had phoned her repeatedly and followed her, but she denied being afraid of Soult, who she thought might have been mentally ill. She admitted that her boyfriend, Fortino Godoy, still had contact with Soult before Soult died and that "she didn't like it."

On June 21, 2004, Detective Morgan searched the dumpster next to Adams's apartment and found a "bundle of branches of rosemary, . . . wrapped with a piece of twine or cord." He later learned that Adams had picked up her paycheck, and that she had left that day for Tijuana.

On July 2, 2004, Detective Morgan again interviewed Adams who indicated that she had just returned from Tijuana. He saw that she had put her hair in a "bob" and bleached it blond.

### C. The Polygraph Examination

On August 4, 2004, Jeannie Brandon, a polygraph examiner with the California Department of Justice, conducted a voluntary and videotaped polygraph examination of Adams. A DVD of the interview was played for the jury, which was also provided with copies of the transcript of the interview.

According to the transcript, Brandon advised Adams at the outset of her "constitutional rights," obtained Adams's agreement to waive those rights, and informed Adams that she could change her mind and terminate the polygraph exam at any time. Brandon informed Adams that the polygraph exam was being given in conjunction with the investigation into the death of Soult. Brandon warned Adams that it was not wise to try to lie and beat the polygraph. Brandon stated that although the case was classified as a homicide, it was possible that whoever started the fire did not intend to kill Soult, but intended only to scare her.

Adams told Brandon that she did not know Soult that well and was acquainted with her only because Soult had previously dated her boyfriend, Godoy. Adams stated that Godoy had pretty much stopped seeing Soult when he started dating her, but was still seeing Soult sometimes. Adams initially denied setting a fire at Soult's home on the night of June 18, 2004, and denied knowing who did. When asked if she suspected anyone, she mentioned Soult's youngest son's friend.

Brandon mentioned an earlier fire at Soult's home and stated that someone had phoned the police with a tip, suggesting that Adams had made comments that Adams had started the first fire, and that next time, she would do it more

professionally, such as by means of a Molotov cocktail. Adams initially claimed to have no idea what this tip was about, then denied making any comment about a Molotov cocktail, then claimed that all she said was that "if" she was to do it, she would do it right. Adams claimed that she was merely joking or bragging.

Brandon suggested that "two sets" of "pretty good" fingerprints had been left at the crime scene, and Adams denied they were hers. Adams stated that she did not know who killed Soult or why, but expressed doubt that Soult's death was intended. Adams related that Soult did not take it well when Godoy broke up with her, stating that Soult "used to call my house and threaten me all the time." Adams claimed that she would "simply hang up." Soult "sometimes" phoned Adams on a daily basis, and the most recent call was about a week before Soult's death. Adams "should have" called the police.

Adams told Brandon that she was afraid of Soult. Soult had followed her home from work in a car and had called her "Susie Q." Soult also had followed her to work when Adams was being driven by Godoy. Soult even had come to Adams's workplace a few times, most recently on the Monday before the fatal fire, but did not say anything.

Adams initially claimed to have worked on the night of June 17, 2005. Godoy had picked her up from work and they watched a movie at her apartment, then went to sleep together, getting up the next morning at around 9:00 or 9:30 a.m. They heard about the fire and Soult's death when "[s]ome guy that walks around and collects cans" told Godoy about it that morning. After learning about Soult's death, Adams stated that she never went back to her job, and instead decided to go on vacation to "San Diego and Tijuana" with a friend.

After Brandon gave Adams the polygraph exam, Brandon informed Adams that "deception" was "indicated," meaning that Adams was "not telling the truth about this fire over there." Brandon again suggested that the fire could have been set by a person who "made a mistake" and "acted without thinking," as opposed to a person who did it to "hurt people." Brandon suggested that Soult "was being a bully" and "may have been asking for this." Brandon suggested that Soult "pushed" Adams to the point that she "couldn't take it anymore," and opined that Adams had not "meant for this to happen . . . for her to die," and then asked, "Did you?" Appellant responded, "No." Brandon asked, "What . . . happened?" Adams ultimately responded, "I don't know. It's like you said. It got out of control." Adams explained that she did not "do it" just so that she could have Godoy, agreeing with Brandon that she did "it" because Soult "was being a bitch" and driving her "nuts." She finally "snapped" when Soult phoned her and called her "a ugly fucking bitch and stuff like that."

Adams related that she went to Soult's house by herself, denying that Godoy was involved. Soult's home was not dark, and Adams did not know if the occupants of the home were asleep. She "took Rosemary and dried it and soaked it in rubbing alcohol for over a week, if not more," which made it "very flammable." She then put it on a chair on the front porch of the house and "lit it on fire" with a match. She then went to the back of the home and did "[t]he same thing," scattering the flammable material, which was in a plastic bag, around the backdoor and setting it on fire with a match. She walked to and from Soult's home. When she got back to her own home, Godoy was still asleep, as "he sleeps pretty heavy." She claimed that she did not mean to kill Soult and considered it to be a case of "temporary insanity" because Soult, who was "psycho," was driving her nuts and causing her to fear for her own life. She felt "horrible" when she learned the next morning that Soult was dead, and took off to Mexico because she was "scared." She admitted starting the first fire on the front porch at Soult's home in March of 2004, stating that she also used rosemary "[s]oaked in rubbing alcohol" on that occasion. During the fatal fire, she "did the back first" and "then the front." It was about 3:30 a.m. on Friday morning, and the lights and TV were on inside the home. She threw over a fence two plastic bags that she used to carry the flammable liquid. She walked from her home to Soult's home along the railroad tracks that ran through town. Although she lit the fires at both the front and back of the house, she thought the occupants could still get out through a window.

Detective Morgan was watching the polygraph examination on closed-circuit television. He entered to speak with Adams. He questioned her about: (1) the rosemary soaked in alcohol; (2) her route to Soult's house; (3) Godoy's lack of awareness of her act; (4) the order in which the two fires had been set; and (5) whether she had encountered anyone. As for why this had occurred, Adams stated that Soult had been calling her for more than two years, and that it had "always been bad. Extremely."

*Defense Case*

Detective Morgan interviewed Soult's son, Lopes, on June 18, 2004. Lopes stated that his mother would sometimes phone and threaten Adams, saying things like "Susie Q, do you want to come out and play with me?" He said that the two women were supposed to meet at a park "to fight," but Adams did not show up. He stated that, two days earlier, his mother had bragged that she had followed Adams and Godoy to Adams's job. He said that the last time he saw Godoy at his mother's house was three weeks earlier.

Detective Morgan also interviewed Glenda Olesen, a friend of Soult's. Olesen said that Soult had told her that Soult, (1) had called Adams to tease and threaten her, and (2) had followed Adams and Godoy to Adams's job.

A custodian of record for Soult's cellular telephone company testified that the call detail records indicated that Soult had made two telephone calls to Adams from the cellular telephone in May of 2004.

Adams testified on her own behalf. She stated that she had first met Godoy around 1999, when they were both working at the same restaurant in Turlock. They became romantically involved about four or five months later and remained involved for four or five years. When they first became romantically involved, Godoy was still living with Soult, but he told her that he and Soult were no longer romantically involved and were just friends. Soult made many threatening phone calls to Adams during those four or five years that Adams dated Godoy. It was "very unusual" if Adams did not get such a call "for a couple of weeks." Soult usually left messages, but Adams would sometimes answer and hang up. Soult also came to the restaurant where Adams worked as a cook and made comments to the waitresses like, "I don't want that bitch cooking my food."

Adams described an incident where she was walking home from work when Soult pulled up in the passenger seat of a car and said, "Hey Susie Q., I'm going to kick your ass, and I'm going to make it so bad that Fortino will never be able to be with you again." Adams went into a park, hoping to "escape that way," but Soult tried to head her off, so she took another route to her apartment. When she finally got to her home, Soult was waiting for her, so she had to hide for 20 to 30 minutes until Soult finally left. This incident occurred about two months before the first fire and made Adams scared for her life. She did not call the police because she thought that it would "agitate the problem."

Adams claimed that, "[f]or a long time," she had kept the jar of rosemary needles that the police seized from her apartment "for seasoning and cooking." She soaked rosemary needles in alcohol so that she could use it to "start the fire" in her hibachi, which was on the patio, and she also used rosemary needles in her "bath water" with other herbs.

Adams thought that starting the first fire would make Soult stop harassing her. She took rosemary with her because she "didn't have anything else." The decision to start the first fire was made on a "[s]pur of the moment." However, according to Adams, Soult's behavior "seemed to get worse" after the first fire.

A few days before the second fire, Soult came to Adams's apartment and followed her to work. The next day, Soult came to the restaurant, spoke with Jaen, and then left. Jaen told Adams that Soult said she wanted to beat up Adams. On the day before the fire, Soult again followed Adams to work. That

evening, Soult called and threatened Adams. Soult "seemed out of control. Her voice was nightmarish and erratic . . . ." Soult phoned three more times; Adams hung up the phone twice and let the answering machine take the last call, shortly before midnight. Adams and Godoy went to bed, but Adams could not fall asleep. Because of her fear of and anger toward Soult, Adams concluded that she had to do something to protect herself.

Adams decided to start another fire. She got out of bed, put some rosemary soaked in alcohol into little plastic bags, and walked over to Soult's house. She put some of the rosemary on the back and front porch and lit it, and walked home. While walking home, she heard sirens and thought, "good, the fire department is coming and everything will be alright" because they would "put out the fire." She was "pretty sure" when setting the fire that Soult was home because Soult's car was there, but she had no information about anyone else being there.

According to Adams, when she gave her initial statement to Detective Morgan, she downplayed her problems with Soult because she thought that it would make her "look more guilty or suspicious." Later, she went to Mexico with a friend for a week and came back and "took the polygraph," as shown by the DVD that was played for the jury.

Adams asserted that the comments that the polygraph examiner made to her, suggesting "maybe it was an accident and somebody didn't mean to kill," led her to believe "they wouldn't, like, press such harsh charges on me, that things wouldn't be so bad for me."

## DISCUSSION

### A.

### Statements During Polygraph Examination[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B.

### Attempted Murder Convictions

Adams also contends that the three attempted murder convictions should be reversed because there was no finding that she had an intent to kill Lopes, Andrea Marr, or J.V. Adams contends that the jury was improperly instructed

---

[*]See footnote, *ante*, page 1009.

on the issue of attempted murder and "kill zone" under CALCRIM No. 600 that the prosecutor misstated the law in closing arguments, and that defense counsel failed to properly object.

Here, the jury was instructed on the attempted murder charges under a modified version of CALCRIM No. 600 as follows:

"To prove that the defendant is guilty of attempted murder, the People must prove that, one, the defendant took direct but ineffective steps towards killing another person.

"And two, the defendant intended to kill that person. [¶] . . . [¶]"

Adams does not challenge this part of the jury instruction. (See *People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176] ["Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."].)

However, the jury was further instructed as follows:

"A person may intend to kill a specific victim or victims, and at the same time intend to kill anyone in a particular zone of harm or kill zone. In order to convict the defendant of the attempted murder of Joseph Lopes, [J.V.], and Andrea Marr, the People must prove that defendant not only intended to kill Kristina Soult, but also intended to kill Joseph Lopes, [J.V.], and Andrea Marr, or intended to kill anyone within the kill zone.

"If you have a reasonable doubt whether the defendant intended to kill Joseph Lopes, [J.V.], or Andrea Marr, or intended to kill Kristina Soult by harming everyone in the kill zone, you must find the defendant not guilty of attempted murder."

Adams's defense counsel had argued that "Adams did not know anybody lived in that house except for Kristina Soult." The prosecutor responded as follows: "And, again, I want to bring up the point of attempted murder with a kill zone. You don't have to know about the other people there."

Adams contends that the prosecutor's argument misstated the law on attempted murder by means of a kill zone and that the latter part of CALCRIM No. 600, which is based upon the "concurrent intent" theory enunciated by the California Supreme Court in *People v. Bland* (2002) 28 Cal.4th 313, 327–328 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*), is ambiguous because it does not fully state or explain the law of attempted murder since it permits

conviction on attempted murder even if Adams was not aware of the presence of the alleged attempted murder victim.

 In *Bland,* the California Supreme Court held that the doctrine of "transferred intent" applies to murder but not to attempted murder. (*Bland, supra,* 28 Cal.4th at p. 327.) "In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder." (*Id.* at p. 317.)

However, the California Supreme Court also recognized that "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 745–746 [37 Cal.Rptr.3d 163, 124 P.3d 730] (*Smith*).)

 In explaining the concurrent intent theory, the California Supreme Court quoted the following language: " 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that

harm to all who are in the anticipated zone. This situation is distinct from the "depraved heart" [i.e., implied malice] situation because the trier of fact may infer the actual intent to kill which is lacking in a "depraved heart" [implied malice] scenario.' [Citation.]" (*Bland, supra,* 28 Cal.4th at pp. 329–330.)

■ "A kill zone, or concurrent intent, analysis, therefore, focuses on (1) whether the fact finder can rationally infer from the type and extent of force employed in the defendant's attack on the primary target that the defendant intentionally created a zone of fatal harm, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm. [Citation.]" (*Smith, supra,* 37 Cal.4th at pp. 755–756 (dis. opn. of Werdegar, J.).)

In *Smith,* the California Supreme Court held that multiple attempted murder convictions could be supported by evidence that the defendant fired a single bullet at two victims even without using a concurrent intent theory. (*Smith, supra,* 37 Cal.4th at p. 746.) In *Bland,* the Supreme Court concluded that multiple attempted murder convictions could be supported under a concurrent intent theory by evidence that the defendant used means that created a zone of harm or a kill zone, such as a hail of bullets or an explosive device. (*Bland, supra,* 28 Cal.4th at pp. 329–330.) Thus, it is the means used that distinguishes attempted murder under a concurrent intent theory from "normal" attempted murder.

■ Where it may be concluded that a defendant has knowledge of the presence of other victims, coupled with the specific intent to kill, that has generally been sufficient to support a reasonable inference that the defendant intended to kill the attempted murder victims. Thus, in *Smith,* the California Supreme Court noted that "where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim," "a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also *all others he knew were in the zone of fatal harm.*" (*Smith, supra,* 37 Cal.4th at p. 746, italics added.) However, we do not agree with Adams's argument that the California Supreme Court's observations on the kill zone theory in *Smith* implies that knowledge of the presence of the alleged murder victims is required before a defendant can be convicted of attempted murder of those persons.

■ First, the observations were mere dicta as the *Smith* court concluded that the attempted murder convictions in that case could be sustained without reference to the kill zone theory. (See *Smith, supra,* 37 Cal.4th at p. 746.) Second, the fact that a rational jury could conclude that a defendant who

knows of the presence of the victims, which was the factual scenario in *Smith*, had the necessary express malice does not preclude a rational jury from concluding that a defendant who does not know of the presence of the victims also had the necessary express malice if the jury found that the defendant intentionally created a zone of harm and that the victims were in that zone of harm. Rather, the concurrent intent doctrine permits a rational jury to infer the required express malice from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm. The concurrent intent theory recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person or persons. The theory imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person or persons despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within that zone could or would die. Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm. (See, e.g., *People v. Vang* (2001) 87 Cal.App.4th 554, 563–565 [104 Cal.Rptr.2d 704] [evidence was sufficient to support attempted murder convictions of inhabitants of residences even though defendants could not see all of their victims because defendants sprayed wall-piercing bullets at residences].)

■ From the evidence, a rational jury could infer that Adams had the necessary express malice for attempted murder because: (1) Adams had the express intent to kill Soult by intentionally creating a zone of harm or kill zone, in that Adams set fires at both the front and back of the house, and (2) that Lopes, J.V., and Marr were within that zone of harm. Thus, we reject Adams's argument that her attempted murder convictions should be vacated because she was not aware of the presence of persons other than Soult at the house.

## C.

### Direct Restitution*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1009.

## DISPOSITION

The convictions are affirmed. The case is remanded for resentencing. The superior court shall prepare an amended abstract of judgment deleting the restitution award to the Turlock Fire Department, and shall forward a copy of the same to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Gomes, J., and Kane, J., concurred.

A petition for a rehearing was denied January 29, 2009, and appellant's petition for review by the Supreme Court was denied April 1, 2009, S170399. Baxter, J., did not participate therein.