Filed 1/27/16  P. v. Granados CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ARMANDO GRANADOS,<br><br>  Defendant and Appellant. | B257627<br><br>(Los Angeles County<br>Super. Ct. No. BA398784) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Gail Ruderman Feuer, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles County District Attorney's Office, defendant and appellant Armando Granados was charged with three counts of attempted premeditated murder (counts 1-3; Pen. Code, §§ 664/187, subd. (a)),[1] and shooting into an inhabited dwelling (count 4; § 246).  It was alleged that appellant committed those offenses for gang purposes within the meaning of section 186.22, subdivision (b)(1)(C).  For count 1, it was further alleged that a principal personally used, intentionally discharged, and proximately caused great bodily injury and death with a firearm.  For counts 2 and 3, it was further alleged that a principal personally used and intentionally discharged a firearm during those offenses.  (§ 12022.53, subds. (b)-(e).)

Appellant pleaded not guilty and denied the allegations.  Trial was by jury.  The jury found appellant guilty as charged, but it found the firearm allegations for counts 2 and 3 were not true.

The trial court denied probation and sentenced appellant to state prison for an aggregate term of 62 years to life.  He was ordered to pay various fines and fees and was awarded presentence custody credit.

Appellant timely filed a notice of appeal.  On appeal, he raises five arguments: (1) He asks that we review the sealed *Pitchess*[2] records for error; (2) The trial court erred in instructing the jury on a kill zone theory of attempted murder on counts 2 and 3; (3) The trial court erred in denying him a reasonable continuance of his sentencing hearing to allow him to retain different counsel; (4) The trial court abused its discretion in imposing consecutive sentences on the three attempted murder counts; and (5) The trial court erred in imposing a concurrent term on count 4 as it should have been stayed under section 654.

We affirm.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

2

# FACTUAL BACKGROUND

I. *Prosecution Evidence*

## A. Gang Tagging Prior to the Shooting

On June 2, 2012, Los Angeles Police Officer David Ramirez discovered evidence that appellant had "tagged" a wall with spray paint at a mark located on South Avenue 18. Officer Ramirez drove to appellant's house and looked inside a blue Toyota belonging to Vanessa Tapia (Tapia), appellant's girlfriend. Tapia's car contained items linking it to the tagging.

According to Mary Neves (Neves), appellant's mother, appellant is a member of the 18th Street criminal street gang. In early June 2012, Neves lived on Avenue 19, inside the territory claimed by the "Clover" gang. While appellant lived at a different location on Dudley Drive, he occasionally stayed with Neves "when he had problems" with his girlfriend. That month, Neves's home was tagged with graffiti displaying the words "East Side Clover" and two "monikers." She may have told police that she felt that she was being singled out because of her son. Neves "just felt like [she] was in the middle of [two] individuals." On June 13, 2012, at around 8:00 p.m., Neves tried to contact appellant by cell phone because she wanted to be taken to the hospital. She was unable to reach him, so she stayed home.

## B. The Shooting

On June 13, 2012, Frank Vaca, Sr. (Vaca), lived with his wife, three sons, and daughter at a house located near the intersection of Mozart Street and Workman. The house has a raised porch in front. At around 8:00 p.m., Vaca and his brother, Jesus, and his son, Salvador, were sitting near the stairs leading up to the porch. They discussed having a Father's Day party for Vaca's father. The rest of Vaca's family was inside the residence.

Suddenly, Salvador tried to warn his father that there was someone in front of the house holding a gun. At trial, Vaca testified that he did not turn in time to see the gunman, but he recalled hearing two or three gunshots, being struck in the back, falling

3

down, and losing feeling in his legs. He also remembered hearing someone yell, "where are [you] from?" He could not remember if he described the shooter for the police.

Vaca was treated by paramedics and taken to the hospital. Along the way, Vaca told Los Angeles Police Officer Jorge Talledo that he saw a man get out of a blue car with a gun. When Vaca tried to run away, he was shot and fell down on his porch.

Salvador estimated that when the shooting occurred, he was three feet away from Vaca and five feet away from Jesus.

Jesus described where the three men were on the porch when the shooting occurred. Jesus was sitting on a couch when he noticed appellant's blue car stop in front of Vaca's house on the closer side of the street. The shooter got out of the car from the passenger side, walked toward the porch, and said, "'Where you mother fuckers from?'" Then, the shooter fired three shots using a small shiny handgun. The shooter appeared to be Mexican-American, in his twenties, and five to five-and-a-half feet tall. Jesus saw appellant in the car's back seat, but he could not see the driver. He saw another unidentified person in the car during the shooting. The shooter returned to the car, and the car headed away.

Salvador ran to the street, where he was able to see the car, a blue Toyota, and obtain a partial license plate number. He saw four people inside the vehicle. Appellant was sitting in the back seat behind the driver. Salvador retrieved his car keys. By the time Salvador reached his car, the blue Toyota had returned to the area. Salvador followed it. Along the way, he called 911. Eventually, the police began pursuing appellant, so Salvador backed off and drove at a distance.

C. Jesus and Salvador Identify Appellant

Later that night, Jesus made a field identification of appellant. Jesus believed that appellant was a passenger during the shooting. Salvador identified the Toyota and appellant as a passenger.

D. Investigation

Los Angeles Police Officer Juan Cobian was assigned to a gang enforcement detail. On June 13, 2012, at around 8:12 p.m., he went to the scene of the shooting,

4

where he saw Vaca on his porch being treated by paramedics. When Officer Cobian learned the description and license plate number for the vehicle used in the shooting, he recalled stopping appellant in that vehicle during April 2012. Officer Cobian knew that the car belonged to Tapia. Officer Cobian provided this information, as well as appellant's address, to other officers investigating the shooting.

Los Angeles Police Officer Geraldine Ruiz and her partner, Officer Edward Castro, were on patrol when the shooting occurred. Officer Ruiz was driving when she saw appellant traveling on Griffin Avenue in the vehicle used during the shooting. Appellant looked "surprised" when he passed her vehicle and quickly made a right turn. She followed the Toyota and checked the license plate number.

Meanwhile, Salvador drove into the area and caught Officer Ruiz's attention. He told her that appellant had shot his father. Officer Ruiz continued to follow appellant onto the 110 Freeway until he exited at Marisol, but was then unable to follow him due to heavy traffic.

Officer Ruiz believed that the shooting was done by an 18th Street gang member while he was in a rival gang's territory (the Clover gang). She went to appellant's home on Dudley Drive. Then she went to another location where appellant had been taken into custody by other officers.

E. Appellant's Home is Searched

During a search of appellant's home, police recovered 44 rounds of .45 caliber ammunition, 20 rounds of nine-millimeter Luger jacketed hollow-point ammunition, and one round of .40 caliber Smith & Wesson ammunition. This ammunition was booked into evidence. The parties stipulated that the nine-millimeter rounds and .45 caliber rounds could be used for handguns, primarily semi-automatic weapons, but were not commonly used for revolvers. The parties also stipulated that appellant was tested for gunshot residue and none was found; the result was inconclusive as to whether he had been around a firearm the day of the shooting.

5

F.  <u>Tapia</u>

According to Tapia, appellant was a member of the 18th Street gang.  In 2012, she owned a blue Toyota Corolla given to her by her mother.  On June 13, 2012, in the afternoon, Tapia let appellant use her car so that he could pick up her daughter from her mother's house.  She saw him leave their home on Dudley Drive by himself, but he did not return with Tapia's daughter as expected.  Between 6:22 p.m. and 8:19 p.m., Tapia sent several text messages to appellant.  She also tried to call him, but he did not answer.  At around 8:30 p.m., appellant returned home without Tapia's daughter.

Later, Tapia, appellant, and Tapia's other child drove to Tapia's mother's house.  On the way, she was pulled over by police.  Appellant seemed nervous at the time.  Appellant and Tapia were arrested and taken to a police station, where she gave a statement.

After Tapia was released and returned home, a man named Franklin went to her house.  She and Franklin spoke with appellant by telephone; a recording of that conversation was played for the jury.

G.  <u>Expert Testimony</u>

According to Officer Cobian, appellant had tattoos on his face indicating membership in the 18th Street gang.  He also admitted that he was a member of that gang.

Los Angeles Police Officer Angelica Gutierrez testified as an expert regarding the 18th Street gang, and provided information regarding the gang's history, hand signs, colors, and rivals (Clover and El Sereno).  She also described the primary activities of the gang and gang members who had committed the required predicate offenses.  She opined that appellant was an 18th Street gang member based on his prior admissions and tattoos.  Based on hypotheticals mirroring the facts of this case, Officer Gutierrez believed that the hypothetical crimes were committed in association with and for the benefit of the 18th Street gang.  The shooting was in retaliation for the tagging by the Clover gang that occurred prior to the shooting.

6

II. *Defense Evidence*

The defense did not present any evidence before resting.

**DISCUSSION**

I. *Review of Pitchess Proceedings*

Appellant asks that we review the trial court's in camera proceedings to determine whether the trial court incorrectly withheld any discovery pertaining to three police officers. The People do not object to our review of the transcripts to determine whether the trial court erred.

We have reviewed the transcript of the trial court's in camera proceedings and have determined that the trial court did not err.

II. *Instruction on Kill Zone Theory of Attempted Murder*

Appellant argues that the trial court erred by instructing the jury on a kill zone theory of attempted murder (CALCRIM No. 600) because no substantial evidence warranted that instruction.

Because appellant failed to object to this instruction at trial, his objection has been forfeited on appeal. (§ 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.)

Appellant asserts that because the alleged error affected his substantial rights, his failure to object does not amount to a forfeiture. "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Thus, we turn to the merits of appellant's argument.

A. Standard of Review

Trial courts have a duty to instruct on the "'"general principles of law relevant to the issue raised by the evidence. [Citations.]"'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) Courts also have a "correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.'" (*People v. Saddler* (1979) 24 Cal.3d 671, 681.)

7

We review claims of instructional error de novo. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

B. <u>Relevant Law</u>

In *People v. Bland* (2002) 28 Cal.4th 313, "the California Supreme Court held that the doctrine of 'transferred intent' applies to murder but not to attempted murder. [Citation.] 'In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder.' [Citation.]" (*People v. Adams* (2008) 169 Cal.App.4th 1009, 1021 (*Adams*).)

"However, the California Supreme Court also recognized that 'a shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]' [Citation.]" (*Adams*, *supra*, 169 Cal.App.4th at p. 1021.)

"'A kill zone, or concurrent intent, analysis, therefore, focuses on (1) whether the fact finder can rationally infer from the type and extent of force employed in the defendant's attack on the primary target that the defendant intentionally created a zone of fatal harm, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm. [Citation.]' [Citation.]" (*Adams*, *supra*, 169 Cal.App.4th at p. 1022.)

C. <u>Analysis</u>

Ample evidence supports the trial court's instruction. There was a kill zone, namely three persons (Vaca, Jesus, and Salvador) standing together on a porch within three to five feet of each other. The shooter fired three times in their direction. From this evidence the jury could reasonably infer that he intended to shoot Jesus and Salvador even though he missed them. (*People v. Smith* (2005) 37 Cal.4th 733, 742.) While

8

appellant claims that there was no evidence that the shooter knew or targeted any particular individual on the porch, Vaca was struck with a bullet; from this evidence, the jury could infer that he was the primary target. And, although appellant argues that there was no evidence that the shooter intended to kill two or more persons, the evidence (namely the firing of three bullets in the direction of three people) indicates otherwise.

*People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*)[3] is factually distinguishable. In that case, the defendants fired 10 bullets at a party inside a building, killing two victims. In addition to murder, one of the defendants was convicted of 46 counts of attempted murder. The Court of Appeal found no evidence that the defendants intended to kill more than one person per bullet fired and ultimately concluded that the evidence supported eight attempted murder convictions. (*Id*. at pp. 799–801, 806–807.) In contrast, in the instant case, the shooter fired three shots at three people, striking one and missing the other two. It follows that this evidence supports the trial court's kill zone instruction.

III. *Denial of Request for Continuance*

Appellant argues that the trial court abused its discretion by denying his request for a continuance to retain private counsel to review grounds for a new trial and to represent him at sentencing.

A. Relevant Proceedings

On September 10, 2012, the preliminary hearing was conducted and appellant was held to answer. On September 24, 2012, appellant was arraigned and pleaded not guilty. Jury selection commenced on or about May 20, 2014. On June 2, 2014, the jury returned its guilty verdicts. Appellant was sentenced on July 9, 2014. Before the trial court pronounced its sentence, appellant's counsel asked to address the trial court. Counsel explained that earlier that day, for the first time, appellant informed his attorney that he was seeking to hire a private attorney to file any necessary presentencing motions.

---

[3] We note that the California Supreme Court has granted review of *People v. Canizales,* review granted November 19, 2014, S221958, a case that is critical of *McCloud*.

9

The trial court framed the issue as "whether to continue the sentencing." It noted that the case was set for sentencing that day, that the jury's verdict had been rendered over a month earlier, that both the prosecution and defense had each filed a sentencing memorandum, and that the court had read the probation report. Thus, the trial court was "basically ready to address the sentencing issues." The trial court then commented that appellant had failed to make his request within a reasonable time after the jury returned the verdicts, which would have been "an appropriate time to put it over as opposed to waiting for today." The trial court noted that if appellant were to retain a private attorney, "that lawyer would need a significant amount of time" to be prepared; thus, the trial court queried as to why the request was not raised earlier.

In discussing the issue with appellant's trial counsel, it was learned that appellant "simply forgot" to tell his attorney that he needed a continuance. When asked if new counsel had been retained, appellant's attorney explained that appellant's family had spoken with Alex Kessel, but had not yet retained him.

The prosecutor opposed the requested continuance.

Ultimately, the trial court denied appellant's request for a continuance, reasoning that it was untimely and appellant had failed to justify the delay in advising the court about his desire to substitute private counsel. The trial court noted that appellant's trial counsel had done "a very thorough and excellent job" at trial. Moreover, the trial court found that a delay would be prejudicial to the victims—they "have a right to have some certainty and resolution of the case in terms of the sentencing, not have it put over about three months." Appellant had not yet even retained private counsel, and "it's speculative whether or not the family would have the funding to retain a private attorney." And, there was no indication that a new attorney would be filing a new trial motion (or that there were grounds to do so); thus, the new lawyer would simply be revisiting the sentencing memorandum.

B.  Relevant Law

Under the Sixth Amendment, a criminal defendant has a constitutional right to be represented by counsel at all critical stages of prosecution.  (*Faretta v. California* (1975) 422 U.S. 806, 818–819.)  While a defendant has the right to counsel of his choice, this right is not absolute.  (*People v. Gzikowski* (1982) 32 Cal.3d 580, 586.)  In this context, a trial court has the discretion to grant or deny a request for a continuance.  (*People v. Courts* (1985) 37 Cal.3d 784, 790.)  A court may deny a request for a continuance where the defendant "is 'unjustifiably dilatory' in obtaining counsel" or "'arbitrarily chooses to substitute counsel at the time of trial.'"  (*People v. Courts*, *supra*, at pp. 790, 791.)  We review the trial court's denial for abuse of discretion.  (*People v. Blake* (1980) 105 Cal.App.3d 619, 624.)

C.  Analysis

The trial court did not abuse its discretion in denying appellant's belated request for a continuance to retain new counsel.  Without explanation, he waited until the day of sentencing to make his request.  While he claims that he "simply forgot" to mention this issue to his assigned counsel, we do not find this contention compelling.

Moreover, while appellant's family had been in contact with Mr. Kessel, there is no evidence that appellant and/or his family had retained him yet.  In fact, there was even some question as to whether appellant had the financial means to retain private counsel.  And, in any event, it seems that the new attorney would only be revisiting the sentencing memorandum, which had already been prepared.  Under these circumstances, there was no abuse of discretion.

Our conclusion is bolstered by the fact that appellant has not shown that he was not being adequately represented.  In fact, appellant was represented by the same assigned attorney throughout the trial proceedings, and the trial court noted that his representation was "thorough" and "excellent."

It follows that the trial court did not err in denying appellant's request for a continuance.

IV. *Consecutive Sentences*

Appellant argues that the trial court abused its discretion when it imposed consecutive sentences for the three attempted premeditated murder convictions.

A.  Procedural Background

At sentencing, the trial court's tentative ruling was to impose the sentences for counts 2 and 3 consecutive to count 1.  It reasoned that the crimes were "heinous" because of the injuries Vaca suffered, namely being "paralyzed for life from the [knee] down, having no working urinary system, difficulty concentrating and other physical impacts."  Appellant was not a minor participant in the shooting; he acquired the car used during the shooting and participated in the actual shooting itself.  The victims were not gang members.  Vaca's wife and children were inside the residence at the time of the shooting.  And, appellant almost faced murder charges as Vaca's injuries were nearly fatal.

The trial court further found that appellant intended to kill all three victims.  The crimes involved "great violence and bodily harm and threat of bodily harm."  A weapon was used to commit the crimes.  Appellant was a serious danger to society.  He was already on probation for a gun charge.  And, the shooting was planned.

Finally, the trial court did note two mitigating factors, including appellant's age (26) and insignificant criminal record.  But, the trial court found that the factors in aggravation outweighed those factors in mitigation.

B.  Relevant Law

Where a defendant has been convicted of a number of serious felonies, each of which separately qualifies the defendant for a life sentence, the trial court has discretion to order that the life terms be served either concurrently or consecutively.  (*People v. Jenkins* (1995) 10 Cal.4th 234, 254–256.)

"Criteria affecting the decision to impose consecutive rather than concurrent sentences include:  [¶]  (a) **Criteria relating to crimes**  [¶]  Facts relating to the crimes, including whether or not:  [¶]  (1) The crimes and their objectives were predominantly independent of each other;  [¶]  (2) The crimes involved separate acts of violence or

12

threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. [¶] (b) **Other criteria and limitations** [¶] Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences." (Cal. Rules of Court, rule 4.425.)

Factors in aggravation are set forth in California Rules of Court, rule 4.421. Factors in mitigation are set forth in California Rules of Court, rule 4.423.

C. Analysis

Here, as the trial court noted at sentencing, appellant's crimes "involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." (Cal. Rules of Court, rule 4.421(a)(1).) His actions demonstrate cruelty because he willfully and knowingly caused pain or distress to others. He was vicious and callous—he hunted down victims that he believed were rival gang members and he attempted to murder them; he participated in a shooting at victims in front of an occupied residence. Any and all of these factors support the trial court's imposition of consecutive sentences.

Moreover, the victims in this case were particularly vulnerable when the shooting occurred. (Cal. Rules of Court, rule 4.421(a)(3).) They were socializing in front of the residence and had no warning or reason to believe that they were targets of a gang. The crimes were planned and sophisticated.

Finally, there were aggravating factors related to appellant. (Cal. Rules of Court, rule 4.421(b).) He engaged in violent conduct indicating a serious danger to society; he attacked innocent people in his failed quest to kill rival gang members; and he was on probation for gun possession when he committed the underlying offenses. (Cal. Rules of Court, rule 4.421(b)(1) & (4).)

In light of this overwhelming evidence, appellant has not demonstrated that the trial court acted outside its discretion in imposing consecutive life sentences.

V. *Concurrent Term on Count 4*

Appellant argues that the trial court erred in imposing a concurrent term on count 4 (shooting at an inhabited dwelling). According to appellant, the sentence should have been stayed under section 654.

A. Relevant Facts

In sentencing appellant, the trial court imposed counts 1 through 3 consecutively. It imposed a separate term of 15 years to life on count 4 and ordered that this term run concurrent with counts 1 through 3. It reasoned that the concurrent term was justified because the evidence showed Vaca's wife and children were inside the house when the shooting occurred.

B. Applicable Law

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." In other words, section 654 prohibits multiple punishments for a single act or omission, even when that act or omission violates more than one statute and thus constitutes more than one crime. Thus, although a defendant may be charged with and convicted of multiple crimes arising from a single act, the defendant may be sentenced only on the crime carrying the highest punishment; the sentence on the other counts arising from the same act must be stayed. (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

If, however, the defendant "harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) The question of whether a

14

defendant harbored multiple objectives within the meaning of section 654 is a question of fact, and we will affirm the trial court's order if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730–731.)

Significantly, there is a "multiple victim" exception to section 654, which allows separate punishment for each crime of violence against a different victim, even if all of the crimes were part of an indivisible course of conduct with a single objective. (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1630–1631; *People v. McFarland* (1989) 47 Cal.3d 798, 803; *People v. Masters* (1987) 195 Cal.App.3d 1124, 1128; *People v. Anderson* (1990) 221 Cal.App.3d 331, 338–339.) As our Supreme Court noted, there is a "greater culpability for intending or risking harm to more than one person," which precludes application of section 654. (*People v. Felix*, *supra*, at p. 1631.)

C. <u>Analysis</u>

Here, appellant and his associates worked together to collectively and repeatedly fire at the Vaca residence. The act of shooting into the Vaca residence was a violent crime that targeted at least one additional and different victim not accounted for by the attempted murder convictions, namely Vaca's wife and children. Accordingly, the prohibition against multiple punishment is inapplicable. (*People v. Felix*, *supra*, 172 Cal.App.4th at pp. 1630–1631 ["There is a multiple victim exception to Penal Code section 654 which allows separate punishment for each crime of violence against a different victim, even though all crimes are part of an indivisible course of conduct with a single principal objective"].) It follows that the trial court did not err in declining to stay the sentence on count 4.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
          ASHMANN-GERST


We concur:


_____, P. J.
     BOREN


_____, J.
     CHAVEZ