Filed 3/5/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054056 |
| v. | (Super.Ct.No. FVA1001265) |
| MICHAEL RAFAEL CANIZALES et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed with directions.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Michael Canizales.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant KeAndre Windfield.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II(1)(a) & (b) and (2)(a) & (b).

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants, Michael Canizales and KeAndre Windfield of first degree murder (Pen. Code, § 187, subd. (a)),[1] during which a principal discharged a firearm proximately causing death (§ 12022.53, subds. (d) & (e)(1)), and two counts of attempted willful, premeditated and deliberate murder (§§ 664/187), during which a principal discharged a firearm (§ 12022.53, subds. (c) & (e)(1)).  The jury found that all the offenses were committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1).)  Canizales was sentenced to 25 years to life and two terms of 15 years to life and Windfield was sentenced to two terms of 25 years to life and two terms of 15 years to life plus 40 years.  They appeal, claiming jury instruction and sentencing error.  We reject their contentions and affirm, while directing the trial court to correct errors in their abstracts of judgment.

I.

**FACTS**

Attempted murder victim, Travion Bolden, testified that he lived on Jackson Street and his friend, Denzell Pride, the other attempted murder victim, was a member of the gang, Hustla Squad, and he had told police that Windfield was a member of the Ramona

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

Blocc gang. Bolden testified that Pride had had problems with Ramona Blocc. Bolden had told the police before trial that Canizales was a known Ramona Blocc gang member.

Pride testified that Bolden was a member of Hustla Squad, then he equivocated. He testified that Windfield was a member of Ramona Blocc. He had told the police before trial that Canizales and Windfield were members of Ramona Blocc.

The prosecution's gang expert testified that Ramona Blocc Hustlas's main rival is Hustla Squad Clicc. In 2007, a Ramona Blocc member was killed by a Hustla Squad member. The expert opined that it would be expected for Ramona Blocc to retaliate violently for the killing of one of its members. He opined that Canizales and Windfield were Ramona Blocc members and that Windfield was the leader. Windfield had a "HSK" tattoo on his shaved head, which stands for "Hustla Squad Killer" and the initials "WC" on his arm, which are the initials for Canizale's gang moniker. The expert opined that Bolden and Pride were Hustla Squad members. He also opined that the shooting was committed for the benefit of, in association with and in furtherance of the Ramona Blocc gang.

The murder victim's friend testified that the murder victim was not from the area around Jackson Street and was there the night of July 18, 2008 with three girlfriends laughing and dancing to the music coming from her parked car as she stood next to it on Jackson Street when she was fatally wounded during the shooting. Another friend testified that the murder victim was a college student who had gone to Jackson Street to visit the friend's aunt and the murder victim had no enemies on that street.

3

A woman named Kennetha testified that she used to date Canizales. She had told the police that she had gotten pregnant by him.[2] According to the police, it appeared as though she was still involved with him at the time she was questioned by them. She testified that Bolden was a Hustla Squad member.

Bolden had told police that in the late morning or early afternoon of July 18, 2008, he was at a fast food restaurant where he saw Canizales and a female, who asked where Pride, Bolden's friend, was.[3] Although Canizales shook Bolden's hand, Bolden thought the female was trying to set up Pride. Pride came into the restaurant and he and Canizales argued over the female, but Bolden did not get involved in the argument and Canizales declined to fight Pride over her. Eventually, Canizales and the girl left, and Bolden left with Pride. Bolden testified that later that day,[4] he was standing on the side of Jackson where his home was, talking with some females, when Kennetha joined their group and called Canizales, who was walking nearby, over. Canizales and Kennetha talked, and Canizales asked Bolden where he was from, meaning with what gang did Bolden associate. Although Bolden testified at trial that Canizales did not ask this question with animosity, and Bolden believed that Kennetha had put Canizales up to asking it, he had told the police before trial that Canizales had asked it in a way that

---

[2] Bolden had told the police that Kennetha was having sex with both Pride and Canizales and she did not know which of the two had fathered her baby.

[3] At trial, he admitted being at the restaurant, but denied seeing Canizales, Kennetha or Pride there or witnessing an argument there.

[4] Bolden told the police it was at 3:00 or 4:00 p.m.

suggested that Canizales wanted to fight Bolden, but the females present told Canizales to knock it off. Bolden testified that he replied that he didn't bang and Canizales walked off towards another fast food restaurant. Bolden had told the police that Canizales had walked off towards the grocery store.

Bolden testified that he felt he had been disrespected during the exchange with Canizales and Kennetha, that Kennetha knew that Canizales and Pride did not get along and he felt Kennetha was trying to "stir the pot" and set him up because she knew Pride and Canizales had problems, so he went to Pride's home and told him what had happened. Bolden had told the police that Canizales had wanted to fight him, but Pride had told Bolden that he knew Canizales was just trying to scare Bolden. Bolden testified that Pride went to where Canizales had been, but Pride's mother and Bolden's mother told him to stop, and Canizales was already gone, anyway. Bolden testified that later, he and Pride were outside Pride's apartment on Jackson Street, where more than 30 people were attending a block party in the street. Bolden testified that the murder victim was standing outside her parked car with the doors open, listening to music and dancing. He testified that he saw a car[5] that had a lot of people in it, then heard Windfield say, "That's that little [racial expletive].[6] Bust," then Windfield removed a gun from his waistband,

---

[5] He testified that because it was dark outside, he could not be sure that this car was the same car he had seen driving up and down an adjacent street while he and Pride stood outside Pride's home.

[6] Bolden also testified that Windfield might have said, "There goes those little [racial expletive], right there," but Windfield could not have meant Bolden because Windfield did not know Bolden.

5

tried to hand it off to Canizales, then Windfield shot it himself. He testified that "bust" meant, "Get out of Dodge or you're going to get shot."[7] Bolden testified that Pride grabbed him after the first shot and Bolden turned around and started running. Bolden testified that when he looked back while running, Canizales was gone, but the shooting continued. He testified that it appeared as though Windfield couldn't control the gun because shots were going everywhere. He testified variously that he did not think Windfield was shooting at him because he was running in front of Pride, "but he was shooting our way" and he did not remember telling the police that Windfield was shooting at him, but he probably did. Bolden testified that Pride ran immediately after the first shot had been fired.[8]

Bolden had told the police that this car had driven up and down the street, then parked and the people inside had gotten out and began walking.[9] One of these people said, "That's the little [racial expletive] right there." Bolden believed this was directed at Pride and Pride began to run. Windfield, who was part of the group, told Canizales, who was also part, "bust." Windfield pulled a gun out of his waistband, handed it to Canizales, then got it back from Canizales and fired it. Bullets hit the gates near where

---

[7] A police department detective testified that it meant, "shoot" in gang-speak.

[8] Bolden testified that he did not know if Windfield continued to fire at Pride as the latter ran, but he had told the police that Windfield did.

[9] He testified that he had not told the police that five to six African-American males had gotten out of the car, but he did say that there were five to six such males in the street.

Bolden was standing. Pride ran across the street from where his home was and towards the park where the street ended. Every time Bolden asked Pride about the shooting, afterwards, Pride told him that it was Squad business. Bolden feared that Pride suspected Bolden of setting him up because Bolden had shaken Canizale's hand and Kennetha kept asking Bolden where Pride was before the shooting.

Bolden testified that he was either unable to recall some of the statements he had made to the police that contradicted his trial testimony or he denied making them.

Kennetha testified to a different version of the encounter between her, Canizales and Bolden before the shooting. She said that she was with the females around 3:00 or 4:00 p.m. when Bolden walked across the street and towards Canizales, saying things about gangs and throwing gang signs. Canizales "banged back" at Bolden and threw gang signs, although she denied telling the police that he identified himself as being from Ramona Blocc or asked Bolden where he was from. Bolden and Canizales seemed angry at each other. She told Canizales to leave and he went towards the grocery store. She contradicted her statement to the police that Canizales had been "banging" for two years. She claimed not to know who Windfield was.

Kennetha had told the police that Canizales had walked across the street from where she and the females were conversing and Bolden yelled at Canizales. Canizales asked Bolden where he was from and told him that he was from Ramona Blocc. There was a heated argument between the two, during which both yelled out gang language. She feared something was going to happen, so she left and 7-10 minutes later, heard

7

gunfire. Fearing that Canizales was involved, she tried to call him but was unable to until an hour later, when they had a casual conversation about shoes and sex. She had told the police that Windfield was a friend of Canizales's. She also told police that when she and Canizales went their separate ways the night of the shooting, he had told her that he was going to the grocery store.

Portions of Kennetha's preliminary hearing testimony were read to the jury. She said that Canizales had said, "Ramona Blocc Hustlas, I will let it be known" and after Bolden yelled something, Canizales said, "Ramona Blocc, let it be known."

Pride testified that Bolden came to his home around 3:30 p.m. on July 18, 2008. He testified that around 6:00 or 6:30 p.m., he went outside and saw that people were partying in the street. When he heard the shots, he ran towards his nieces and pushed them back into his home, then went back outside and saw the murder victim on the ground. He testified that he saw three males on the adjoining street, but it was dark and he did not know who fired the shots. He said he did not feel as though he was being shot at when he ran towards his nieces. While testifying, Pride made various statements about telling the police that someone had said, "Look, whoo, whoo" and there was a stopped car at the corner and three African-American men were walking in the middle of the street and one pulled out a gun and said, "Bust" and started shooting. He denied telling the police that the shooter got the gun from his pants He testified that he did not know who Canizales was. He denied seeing Bolden at the time of the shooting.

8

Pride had told the police before trial that Bolden had had an argument with Canizales, from Ramona Blocc, and Bolden had come to Pride's home and told Pride what had happened. Pride had told the police that he and Bolden were standing outside Pride's home when they saw Canizales "come back through." Pride had also told the police that Windfield was the shooter, who had uttered the word, "Bust" and this was based on the shooter's build and his deep voice[10] (Windfield and Pride had gone to elementary school together). He claimed he ran to his apartment after the first shot was fired.

Bolden's mother testified that some time before the shooting, she was standing with Bolden on Jackson Street with three to four females when one of them, Kennetha, called out to Canizales, who came over. Canizales and Bolden exchanged, "What's up?" and Bolden's mother though Canizales was being somewhat aggressive with her son. Bolden's mother later saw a man standing side by side with Canizales in the street where Jackson intersected another street. He pointed a gun down Jackson. She heard shots, saw that Canizales remained where he was during them, ducked down, then saw this man, still holding the gun, and Canizales running off in the same direction.

A police department explorer, who had attended school with Canizales and was a friend of Windfield, testified that she was on ride-along on the night of July 17, 2008, when she saw Canizales and Windfield at the scene of an incident involving Ramona

---

[10] At trial, he denied that the shooter had a deep voice or that he told the police this.

Blocc.  At 10:20 p.m. on July 18, 2008, she was at the aforementioned grocery store when she saw Canizales and Windfield outside the store.  She saw a car with two people in it pull up in front of them.  She recognized the driver of the car as one of the arrestees from the night before.  Windfield touched the hood of the car and it stopped.  He went to the driver's side and had a conversation with the driver, while Canizales stood "in the immediate area of the car."  Windfield told the driver to "Roll up in the whip," and the driver shook his head in acknowledgement.  This means, "[Y]ou go in the car."  Windfield said something to the driver involving the word, "We'll" while he made a motion towards Canizales.  As the car pulled away, Canizales and Windfield yelled "Jackson Street" as Windfield patted the car again.  Canizales led the way as he and Windfield moved towards Jackson Street, yelling loudly, "Ramona Blocc" and throwing up gang signs.  They energetically pivoted and skipped, as though dancing, and continuing to yell out "Ramona Blocc" as they moved.  Five to ten minutes later she heard the sirens and helicopters that had apparently responded to the shooting.

A female friend of Windfield's family testified that in June 2009, she was at Windfield's house when Windfield casually told her, while playing a video game, that he and Canizales had killed a girl on West Jackson Street, but they had only "done" three days in jail and "got off."  Windfield explained to the female that the police had no evidence or witnesses and that was why he only "did" three days.[11]  Windfield also said

---

[11]  Bolden's mother testified that, to protect her son from harm, after the shooting, she sent him away so the police could not question him and they were unable to find him.
*[footnote continued on next page]*

that he and Canizales had gone to the scene of the crime to "get" a Hustla Squad member who had killed Windfield's cousin. He said Hustla Squad members were his enemies. He explained that the girl got killed because she got in the way when a Hustla Squad member "they" were shooting at ran. She had heard Windfield refer to himself as part of Ramona Blocc and proudly talked about it to his friends and with fellow gang members. She had also heard Canizales talk about Ramona Blocc a lot, and not in private, and she saw him with another Ramona Blocc member.

A police department detective testified that several days after the shooting, Canizales gave him various accounts of his whereabouts on the night of July 18, 2008, but when confronted with a surveillance video taken at the grocery store that night, admitted that he had been there. He claimed that he was afraid that if he returned home from the store the way he came there, he would be jumped, so he told the boy that was with him to find his sister and tell her to have his brothers come to the store and get him.

The parties stipulated that five bullet casings, consistent with the fatal bullet, were recovered from the crime scene. They were 100 feet from where the murder victim had been hit.

---

*[footnote continued from previous page]*
Pride testified that hours after the shooting, he moved away with his brother at his mother's insistence.

ISSUES AND DISCUSSION

1. *Jury Instructions*

a. *Judicial Council of California Criminal Jury Instruction, CALCRIM No. 400*

The jury was given CALCRIM No. 400, the following standard instruction, "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it"[12]

---

[12] In the wake of cases we discuss below, the "equally guilty" language of CALCRIM No. 400 has, since this trial occurred, been removed. (*People v. Loza* (2012) 207 Cal.App.4th 332, 348, fn. 8 (*Loza*).) Albeit that in certain cases, this language could be misleading or confusing, appellate courts have repeatedly held that CALCRIM No. 400 is a correct statement of the law. (See, e.g., *Loza*, at p. 350; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 (*Samaniego*).) The fact that the prosecutor, in her argument to the jury, referred to this instruction, did not, as defendant now claims, "reaffirmed the error." The prosecutor argued that Canizales "got the ball rolling" by arguing with Bolden earlier that day and shouting gang slogans. He asked a juvenile to go get his brothers to help, in particular, Windfield, the Hustla Squad Killer, as Windfield's tattoo stated he was, bringing him to where Canizales knew Hustla Squad gang members were. Further, he lead the way of members of Ramona Blocc, including Windfield, by doing an amped up side step dance to the location of the shooting, where he and Windfield shouted out gang names. The prosecutor pointed out that Canizales's guilt was as an aider and abettor, that an aider and abettor is equally guilty as the perpetrator, and one can be an aider and abettor simply by instigating what the perpetrator did. The prosecutor went on, "That's partly what . . . Canizales did. He instigates the situation: [He] call[s] Bolden and Pride during the earlier confrontation over, get[s] the plan going, walk[s] over [to the scene of the shooting later], lead[s] the way over to . . . [the scene of the shooting]. I anticipate that [counsel for Canizales] is going to argue to you, [']But [Canizales] didn't shoot. How

*[footnote continued on next page]*

Canizales here contends that this instruction, as to the murder charge, "improperly tied the aider and abettor's mental state to that of the perpetrator's, thereby lowering the prosecution's burden of proof." We see no such statement or even insinuation in CALCRIM No. 400. More importantly, the jury was also given CALCRIM No. 401, which provides, in pertinent part, "to prove that defendant, . . . Canizales, is guilty of a crime based on aiding and abetting that crime, the People must prove that: The perpetrator committed the crime; *the defendant knew that the perpetrator intended to commit the crime*; before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she *knows of perpetrator's unlawful purpose* and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CALCRIM No. 401, italics added.) Canizales does not assert that this is not a correct statement of the law and it

---

*[footnote continued from previous page]*
can you find him guilty . . . ?[']  . . . You can't put a ball in motion that gets somebody killed like that and just say, [']Well, . . . I didn't shoot. You shouldn't find me guilty.['] [¶] . . . [Canizales is] an aider and abettor beyond a reasonable doubt in this case, and he needs to be convicted of the charges equally like the perpetrator of the crime." The prosecutor argued that the plan for Canizales and Windfield to go to Jackson Street and shoot at the person who killed Windfield's cousin was premeditated, willful and deliberate. She said that Canizales's intent can be gleaned from the fact that within a short time after the shooting, he spoke on the phone to Kennetha casually about shoes and sex, signifying that he was unconcerned about the murder victim, and he and Windfield "had time [to consider what was going to happen, t]hey met at the [market, t]hey discussed it[, t]here was a plan [to r]oll up in the [car]." She asserted that "what they [(meaning, Canizales and Windfield)] did was . . . willful, deliberate and premeditated."

13

properly described the mental state necessary for Canizales to be convicted on an aiding and abetting theory. (*People v. Lee* (2003) 31 Cal.4th 613, 624; *People v. Beeman* (1984) 35 Cal.3d 547, 561.) In *People v. Mejia* (2012) 211 Cal.App.4th 586, 625 (*Mejia*), the inclusion of the equally guilty language in CALCRIM No. 400 did not require reversal of the conviction where CALCRIM No. 401 was given. The jury was also instructed that a defendant could not be guilty of first degree murder unless he acted willfully, i.e., with intent to kill, deliberately and with premeditation. The prosecutor's argument to the jury was that Canizales acted willfully, and with premeditation and deliberation.[13]

Canizales asserts that CALCRIM No. 400 was also defective because "[i]t . . . fail[ed] to inform the jury that an aider and abettor . . . can be guilty of a lesser crime than the perpetrator." Canizales cites *Samaniego*, in support of his position that the trial court had a sua sponte duty to modify the standard instruction to include this concept. Ironically, *Samaniego* held that the defendant's failure to request such a modification forfeited an identical complaint on appeal. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1163; Accord, *Mejia*, *supra*, 211 Cal.App.4th at pp. 586, 624; *People v. Loza* (2012) 207 Cal.App.4th 332, 350 [Fourth Dist, Div. One].) Further, *Samaniego* found the presence of CALCRIM No. 401, quoted above, ensured that if the jury convicted Canizales under this theory, it found that he premeditated and deliberated. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1166.) Although *Samaniego* did not so hold, we conclude that another provision of CALCRIM No. 401 given here, i.e., that

---

[13] See footnote 12, *ante*, pages 12 and 13.

14

"defendant intended to aid and abet the perpetrator in committing" premeditated and

deliberate murder (*ibid*), along with the instructions on first degree murder, ensured that

the jury, if it convicted Canizales under this theory, found that he had the intent that the

murder victim be killed.[14]  *Samaniego* held that another instruction given in that case,

[14] In a letter brief submitted before oral argument, Canizales called our attention to *People v. Ramirez* (2013) 219 Cal.App.4th 655, which parted company with this holding in *Samaniego*.  However, as counsel conceded during oral argument, review has been granted in *Ramirez*.  (*People v. Ramirez*, review granted Dec. 18, 2013, S214133.)

To the extent Canizales wishes to advance the holding in *Ramirez*, without citing it as authority, we must note our disagreement with it.  Canizales refers to the instruction differentiating the degrees of murder, which was also given here, thusly, "A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted willfully if he intended to kill.  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  The defendant acted with premeditation if he decided to kill *before committing the act that caused death*."  While Canizales implies that, under this instruction, the jury could not find that the aider and abettor was guilty of first degree murder unless he acted willfully and deliberately, the above-italicized portion implied that only the actual perpetrator had to premeditate, and was, therefore, improper.  We view this as a tortured interpretation of the instruction.  If Canizales intended that the victim be killed and he carefully weighed the considerations for and against the decision that the victim be killed, and, knowing the consequences, decided that the victim be killed, it strains credulity to believe that the jury did not also find that he premeditated.  Moreover, the way this instruction is worded required the jury to tweak it in applying it to Canizales.  According to its exact wording, the only defendant to whom it could apply would be Windfield because it required that the subject of the instruction "decided to kill" not that he decided that the victim be killed.  We cannot accept, and Canizales does not even allege, that this instruction was not available for use by the jury to convict Canizales as an aider and abettor to first degree murder.  Finally, in arguing to the jury that Canizales acted with premeditation and deliberation (see fn. 12, p. 13), the prosecutor cleared up any possible ambiguity created by this instruction.  (See *People v. Kelly* (1992) 1 Cal.4th 495, 526.)  Additionally, *Samaniego*, which Canizales cited in his opening brief, held, "It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without a least a brief period of deliberation and premeditation . . . ."  (*Samaniego, supra*, 172 Cal.App.4th 1148, 1166; Accord, *People v. Lee* (2003) 31 Cal.4th 613, 624.)

which was also given here providing that if one acts with intent to kill, one acts willfully, ensured that the jury found that the defendant so acted. (*Samaniego,* at p. 1165.)

Canizales also cites *People v. Nero* (2010) 181 Cal.App.4th 504 in support of his argument that the trial court here had a sua sponte duty to instruct that he could be convicted of a lesser crime than Windfield. However, in *Nero*, the jury asked, during deliberations, whether the aider and abettor must receive the same level of guilt as the perpetrator, or could she receive a higher or lower degree of murder or manslaughter. (*Id.* at p. 511.) The trial court responded that the aider and abettor "can bear no greater responsibility [than the perpetrator] as far as the degree." (*Ibid.*) When asked if the aider and abettor could bear less responsibility, the trial court responded that the jury could find the aider and abettor not guilty. (*Ibid.*) Another juror asked whether, given that a defendant was guilty of aiding and abetting, does the aider and abettor's level of murder or manslaughter have to be the same as the perpetrator or could it be different. (*Ibid.*) The court reread the then equivalent of CALCRIM Nos. 400 and 401, including the "equally guilty" language in the former. (*Ibid.*) After two jurors said these instructions were helpful, the court, reiterated, in part, "Each principal, regardless of the extent or manner of the participation, is equally guilty." (*Ibid.*) The appellate court in *Nero* concluded that the aider and abettor instructions, despite hinting that the aider and abettor's mental state was not tied to the perpetrator's, were obviously (due to the jury's questions) confusing and should have been modified. (*Id.* at p. 518.) Specifically, the appellate court held, "[W]here as here, the jury asks the specific question whether an

16

aider and abettor may be guilty of a lesser offense, the proper answer is 'yes . . . .' The trial court, however, by twice rereading [the then equivalent of CALCRIM No. 400] in response to the jury's question, misinstructed the jury." (*Ibid*.) Here, the jury did not ask questions as did the jury in *Nero*. As Division One of this court observed in *Loza*, "If [Loza] had involved only the [trial] court's instructing the jury with the 'equally guilty' language from . . . CALCRIM No. 400, we might have . . . concluded that any error in the [trial] court's use of th[is] . . . language was harmless." (*Loza*, *supra*, 207 Cal.App.4th at p. 352.)

Having concluded that the instructions given adequately conveyed to the jury what it needed to find in order to convict Canizales of first degree murder as an aider and abettor, we necessarily reject Canizales's contention that his trial counsel was incompetent for failing to request a modified instruction.

b. *CALCRIM No. 403*

The jury was given a modified version of CALCRIM No. 403, the standard instruction on natural and probable consequences, as a theory of Canizales's guilt of the murder alternative to the theory that he aided and abetted the murder. That instruction provided, "Before you may decide whether defendant, . . . Canizales, is guilty of murder under this theory, you must decide whether he is guilty of assault with a deadly weapon. [¶] To prove that the defendant is guilty of murder, the People must prove that: 1. The defendant is guilty of assault; 2. During the commission of assault a co-participant in that assault committed the crime of murder; and under all of the circumstances, a reasonable

17

person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault. [¶] And this is for the theory of natural and probable consequences. [¶] A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the assault, then the commission of murder was not a natural and probably consequence of assault. [¶] To decide whether the crime of assault was committed, please refer to the separate instructions that I will give you on that crime. (See CALCRIM No. 875.)"

Canizales here contends that the trial court had a sua sponte duty to inform the jury that he could be convicted of a lesser included offense than first degree murder even if Windfield was convicted of first degree murder.[15] Specifically, he asserts that the jury should have been instructed "that second degree murder was also the natural and probable consequence of the assault with a deadly weapon[.]" However, the above-quoted instruction referred to murder, not first degree murder, as did the instruction that

_____

[15] In the same letter brief (see fn. 14, *ante*, p. 15), Canizales cited *Ramirez* in support of his criticism of CALCRIM No. 403, while conceding that he did not advance this particular criticism of the instruction in his briefs. We note, again, that *Ramirez* cannot be cited as authority. (*Ibid.*)

18

Canizales was guilty "*of murder*" under two theories—including natural and probable consequences. Because the jury was given instructions on both first and second degree murder, committed by "*the defendant*," it was not precluded from using the natural and probable consequences theory to convict Canizales of second degree murder.[16] Moreover, by convicting Canizales of first degree murder, rather than second degree murder, the jury necessarily rejected the possibility that the only natural and probable consequence of the assault with a firearm he aided and abetted was a less serious crime. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 276.) If Canizales wanted a specific instruction that he could be convicted of second degree murder under this theory, he

---

[16] We assume, for purposes of argument only, that *People v. Woods* (1992) 8 Cal.App.4th 1570 (*Woods*) was correctly decided. *Woods* held that the trial court erred in telling the jury that the aider and abettor of the target offense could not be guilty of second degree murder under the natural and probable consequences theory if the perpetrator was guilty of first degree murder. (*People v. Favor* (2012) 54 Cal.4th 868, 876 (*Favor*).) *Woods* reasoned that "If the evidence raises a question whether the offense charged . . . is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense . . . ." (*Woods*, at p. 1593.) Contrary to defendant's contention, the split of authority in the California appellate courts of which *Woods* is a part was not resolved by *Favor*, which dealt with the peculiarities of attempted murder. (*Favor*, at p. 877 ["Because *Woods* involved murder—not attempted murder—where there are different degrees of the offense, [the] reliance [of *People v. Hart* (2009) 176 Cal.App.4th 662, also an attempted murder case,] on Wood's lesser included offense analysis is misplaced."].) [It should be noted that *Favor* disapproved of *Hart*. (*Id*. at p. 879.).] Rather, the issue is still pending before the California Supreme Court in *People v. Chiu* (S202724) although *Chiu* is distinguishable from this case because the instructions on the degrees of murder there referred to "the perpetrator," thereby excluding the aider and abettor from the possibility of being convicted of second degree murder, whereas here they referred to "the defendant," thereby permitting the jury to convict Canizales of second degree murder.

should have requested it, but did not. However, because we conclude that the jury could have convicted him of second degree murder given the instructions submitted to it, we necessarily reject his additional contention that his trial counsel was incompetent for failing to request this specific instruction. Moreover, he cannot demonstrate prejudice, as there is no reasonable possibility that the jury having a specific instruction that it could convict Canizales of second degree murder while convicting Windfield of first degree murder would resulted in Canizales being convicted of the former. (*Strickland v. Washington* (1984) 466 U.S. 668.) This is so because even under the authorities on which defendant relies,[17] the evidence must raise a question whether first degree murder is a natural and probable consequence of the assault with a firearm, but the evidence would support a finding that second degree murder was such a consequence. (*Prettyman*, at p. 276.) So, what facts here raise a question whether first degree murder is a natural and probable consequence of Windfield's assault with a firearm? Defendant asserts it is the facts that Canizales's pre-shooting encounters with Bolden and Pride at the fast food restaurant and on Jackson Street ended without violence, Canizales's statement to Pride that he was not going to fight him over a female, Pride's statement to Bolden that Canizales was not going to fight him—that Canizales just wanted to scare him, that Canizales came unarmed to the confrontation, that he refused to fire when handed the gun by Windfield and that there was evidence that he ran as soon as the shooting began. However, these facts have nothing to do with the question whether first degree murder is

---

[17] See footnote 16, *ante*, page 19.

a natural and probable consequence of Windfield arming himself and firing five bullets at Hustla Squad members during the confrontation in which Canizales knowingly participated. (See *People v. Canizalez* (2011) 197 Cal.App.4th 832, 852 ["[A]ider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor at all. . . . Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant . . . ."].) The question is whether the evidence suggested that it was reasonably foreseeable from the gang-related assaults with a firearm[18] that Hustla Squad gang members would be intentionally shot, but it was not reasonably foreseeable that they would be shot willfully, deliberately and with premeditation. Clearly, the latter, rather than the former, was such a consequence. (See *People v. Padilla* (1995) 11 Cal.4th 891, 920, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

   c. *Kill Zone Instruction on Attempted Murder*

      1. *The Law on Kill Zone*

In *People v. Bland* (2002) 28 Cal.4th 313, 328-330, 333 (*Bland*), the California Supreme Court explained, "[A defendant] who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder . . . if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. . . . [¶] . . . [¶] [However, t]he

---

[18] In his briefs, Canizales concedes that he "organize[d] a retaliatory shooting . . . by summoning Windfield and . . . join[ing] Windfield in the fray[.]"

21

conclusion that transferred intent does not apply to attempted murder still permits a [defendant] who shoots at a group of people to be punished for the actions towards *everyone in the group* even if [the defendant] primarily targeted only one of them. . . . [A] defendant might be guilty of . . . attempted murder of *everyone in the group* . . . . [¶] . . . [T]he fact that a [defendant] desires to kill a particular target does not preclude finding that the [defendant] also, concurrently, intended to kill others within what it termed the 'kill zone.' 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude [that the defendant] intended to ensure harm to the primary victim by harming *everyone in that victim's vicinity*. . . . [C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B and C, and attacks the group with automatic weapon fire . . . devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact *may reasonably infer from the method employed an intent to kill others* concurrent with the intent to kill the primary victim. When a defendant escalate[s] his mode of attack from a single bullet aimed at A's head to a hail of bullets . . . , the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can *reasonably infer that the defendant intended that harm to all* who are in the anticipated zone . . . ." (*Id*. at pp. 328-330.) "[T]he evidence here virtually compelled a finding that even if defendant primarily

22

wanted to kill [the murder victim], he also, concurrently, intended to kill the others in the car. *At the least, he intended to create a kill zone*." (*Id*. at p. 333.)

We now turn our attention to *People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*), upon which Canizales heavily relies in his criticism of the kill zone instruction given in this case. *McCloud* begins its discussion of the kill zone theory by citing language in *People v. Smith* (2005) 37 Cal.4th 733 (*Smith*) about that theory. *Smith*, however, is not a kill zone case, so anything said about the theory therein is dicta. (Accord, *People v. Adams* (2008) 169 Cal.App.4th 1009, 1022 (*Adams*).) Moreover, *Smith* interpreted the reasoning in *Bland*, which we have extensively quoted above, to mean that "a shooter may be convicted of multiple counts of attempted murder on the 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in the area around the targeted victim . . . as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm."[19] (*Smith*,

_____

[19] However, in *Bland*, the California Supreme Court cited with approval the holding in *People v. Vang* (2001) 87 Cal.App.4th 554, 564 (*Vang*), that "' the fact that [defendants] could not see all of their victims did not somehow negate their . . . intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed.'" (*Bland*, *supra*, 28 Cal.4th at pp. 313, 330.) In *Adams, supra,* 169 Cal.App.4th 1009, 1023, the appellate court noted that the language in *Smith* was dicta, and, even if it had not been, it did not "preclude a rational jury from concluding that a defendant who does not know of the presence of the victims . . . had the necessary express malice if the jury found that the defendant intentionally created a zone of harm and that the victims were in that zone of harm."

23

*supra*, 37 Cal.4th at p. 746.)  At the same time, the *Smith* court quoted *Bland*'s language that, "'The . . . kill zone . . . theory is simply *a reasonable inference the jury may draw* in a given case; a primary intent to kill a specific target does not rule out a concurrent intent to kill others.'"  (*Smith*, at p. 746.)

Based on this language, and with no further citation to any precedent, *McCloud* states, "The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury.  Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual.  Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located*.  The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area.  In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located.  [¶]  . . . [T]he defendant *specifically intends* that *everyone* in the kill zone die.  If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of attempted murder."  (*McCloud*, *supra*, 211 Cal.App.4th at p. 798.)

In our view, *McCloud* goes too far. The language in *Bland*, cited above, posits that the intent to kill the nontargeted person(s) *can be inferred* from the nature and scope of the attack or from the method employed. If, as *McCloud* asserts, the defendant must in fact intend to kill each attempted murder victim, there is no reason to employ the theory—the intent to kill is established without resort to the theory. That *McCloud* overstates the theory is proven by language in other California Supreme Court opinions. In *People v. Stone* (2009) 46 Cal.4th 131, 136, 137 (*Stone*), the High Court said of *Bland*, "The evidence supported a jury finding that the defendant intended to kill the driver [of the car into which he shot] but *did not specifically target* the two who survived. [Citation.] . . . We summarized the rule that applies when an intended target is killed and *unintended* targets are injured but not killed. . . . [¶] . . . [I]f a person targets one particular person, . . . a jury could find the person *also*, concurrently, intended to kill— and thus was guilty of the attempted murder of—other, *nontargeted* persons." (Some italics original, some added.) In her dissent in *Smith*, *supra*, 37 Cal.4th at pages 755 and 756, Justice Werdegar said, "A kill zone . . . analysis . . . focuses on (1) whether the fact finder can rationally *infer from the type and extent of force employed* in the defendant's attack on the primary target *that the defendant intentionally created a zone of fatal harm*, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm." (Italics added.)

Language in opinions of the Court of Appeal also suggest that *McCloud* misstates the kill zone theory. In *Adams*, *supra*, 169 Cal.App.4th 1009, 1023, the Fifth District

said, "[T]he . . . [theory] permits a rational jury *to infer the required express malice* from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm.  [It] recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person . . . .  [It] imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person . . . despite the recognition, or with the acceptance of the fact, that . . . *a natural and probable consequence of that act would* [*be that*] *anyone within the zone could or would die*."  In *People v. Campos* (2007) 156 Cal.App.4th 1228, 1243, the appellate court held, "The [kill zone] theory . . . is simply a reasonable inference the jury may draw in a given case . . . ."

Moreover, *McCloud*'s restrictive view of the kill zone theory cannot possibly be reconciled with the holding of two different appellate courts, and the approval by the California Supreme Court of one of those holdings, that kill zone victims can include those not seen by the defendant or of which the defendant is unaware.  (See fn. 19, *ante*, p. 23.)

2.  *Kill Zone Instructions Given Here and Defendants Arguments*

The jury was given the following instruction on the intent necessary for attempted murder, "To prove that a defendant is guilty of attempted murder, the People must prove that: 1. The defendant took a direct but ineffective step toward killing another person; and 2. The defendant intended to kill that person.  [¶]  . . .  [¶]  A person who attempts to

26

commit murder is guilty of attempted murder even if, after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control.  On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder. [¶]  A person may intend to kill a particular victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict a defendant of the attempted murder of . . . Bolden, the People must prove that the defendant not only intended to kill . . . Pride but also either intended to kill . . . Bolden, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill . . . Pride by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder."

The prosecutor argued that after Bolden and Canizales had a heated gang-inspired verbal confrontation, Canizales and Windfield, Ramona Blocc members, went to Jackson Street to shoot at a member of the rival, Hustla Squad, of which Bolden and Pride were members, to avenge the death of his cousin.  She argued that this was the plan of both Canizales and Windfield.  She said that Windfield shot five times "trying to kill that rival gang member.  She continued, "[Bolden] told you that the initial person that was being shot at was [Pride].  In [his interview with police] he tells you [that] at one point he runs out; he's being shot at.  So that's why you have those counts of attempted murder.  You have . . . the one count of attempt[ed] murder on [Pride] and on [Bolden], because they're

27

both being shot at. When you're being shot at, the assumption is somebody is trying to kill you." "[Canizales and Windfield] tried to kill someone, but they weren't successful. . . . And they intended to kill that person. Well, [Bolden and Pride are] both Hustla Squad. You have a motive of why [Canizales and Windfield are] out there. They are trying to kill Hustla Squad, right? [¶] . . . [Bolden] told you very clearly they were shooting at [Pride], but [Pride] turned around and ran and they're shooting at him. And then at one point [Bolden] tells you he runs out and they're shooting at him. . . . So . . . Windfield shot at both of them. That's why you have a count for each one of the attempts. [¶] There's also this concept of kill zone within attempt[ed murder]. If they're shooting at someone and people are within the zone that they can get killed, then you're responsible for attempted murder as to the people who are within the zone of fire.[20] So there were times when [Bolden] told you that he was with [Pride], near [Pride], [in] close proximity to [Pride]. So they're both within the zone of fire, the range of bullets that are coming at them."[21] Neither defense counsel mentioned the kill zone theory, as both insisted that the evidence did not prove beyond a reasonable doubt that their clients had participated in the shootings.

---

**20** At oral argument, Windfield isolated this sentence from the rest of the prosecutor's argument and asserted that it was an incorrect statement of the law. However, the prosecutor's entire argument in regard to the kill zone theory was that Bolden was so close to Pride, the primary target, that the jury could infer the intent to kill him from the shots fired near both of them. This is *not* an incorrect statement of the law.

**21** How Canizales can categorize this as "stress[ing] th[e kill zone] theory in closing argument" is beyond us.

Defendants first assert that there was insufficient evidence to support a kill zone instruction. In so doing they rely on two cases in which just one bullet was fired. In *Stone, supra,* 46 Cal.4th 131, just one bullet was fired into a crowd of "about 10." (*Id.* at p. 135.) Although not its holding,[22] the High Court in *Stone* agreed with the appellate court's conclusion that "'[t]here was no evidence . . . that [defendant] used a means to kill the [alleged attempted murder victim] that inevitably would result in the death of other victims within a zone of danger.'" (*Id.* at p. 138.) Here, in contrast, five bullets were fired—under the kill zone theory, Pride was the primary target. Thus, the jury could reasonably infer that Windfield used a means to kill Pride that inevitably would result in the death of other victims within the zone of danger.

The same is true of the other case defendants cite, *People v. Perez* (2010) 50 Cal.4th 222 in which the defendant fired one bullet into a group of eight people. (*Id.* at p. 225.) The High Court concluded that this did not constitute "a means of force calculated to kill everyone in the group." (*Id.* at p. 225.) Further, the court noted that the prosecutor had conceded that the defendant "did not intend to 'kill everybody in the group . . . .'" (*Ibid.*) In contrast, in *McCloud, supra*, 211 Cal.App.4th at pages 788, 791, 794-795, 799-800, whose language we have already criticized, the appellate court held that the kill zone theory did not apply where 10 bullets were fired from a parking lot into a building with a semiautomatic handgun, killing two and wounding a third who had been inside. Two

---

[22] The holding was that the mental state necessary for attempted murder was the intent to kill *a* human being, not the intent to kill *a specific* human being. (*Stone*, *supra*, 46 Cal.4th at pp. 131, 134.)

bullets had struck a car in the parking lot, five had struck the exterior wall of the building and three had hit the window of the building, passed through it and hit the three wounded victims.  (*Id*. at p. 794.)  There had been over 400 people present inside and just outside the building and defendants had been charged with the attempted murder of 46 people.  (*Ibid*.)  The appellate court stated, "[T]he record contains no evidence that [the defendants] tried to kill 46 people with 10 bullets.  Nor does the record contain evidence that it would have been possible for them to kill 46 people with 10 bullets (given the type of ammunition and firearm they used), or that they believed or had reason to believe it was possible. . . .  As in *Perez,* there is no evidence that [the defendants] 'specifically intended to kill two or more persons with [a] single shot' [citation], much less that they specifically intended to kill the 4.6 people per shot that would be necessary to support [the] application of the kill zone theory.'" (*McCloud* at pp. 799-800, fn. omitted.)

Defendants cite no authority for their proposition that the existence of a kill zone "requires a defined area that can be saturated with the kind of lethal force the defendant chooses to use."  Moreover, the jury had before it the measurements of the crime scene, and detailed descriptions of the positioning of all parties by Bolden, Pride and other eyewitnesses.  It was for the jury to make the decision whether Windfield created a kill zone when he fired and whether Bolden was in it.  Defendants' position, contrary to their assertion, is not supported by *Vang*.

In *Vang*, at least 50 bullet holes dotted the front of both units of a duplex, although the majority were on the duplex occupied by the victims.  (*Vang*, *supra*, 87 Cal.App.4th

at p. 558.)  The bullets had been fired by an AK series assault rifle and a shotgun.  (*Ibid*.)  There was extensive gun fire damage throughout both units.  (*Ibid*.)  At a second residence, the assault rifle had been used to spray bullets at an apartment.  (*Ibid*.)  Each of the residences contained one primary victim.  (*Id*. at p. 563.)  The defendants conceded that the evidence proved that they intended to kill these two primary victims, but because the bullet holes centered around where these two could be seen from where defendants fired, there was insufficient evidence of the defendants' intent to kill the nine others in the two residences.  (*Ibid*.)  The appellate court concluded, "The jury drew a reasonable inference, in light of the placement of the shots, the number of shots and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residence they shot up.  [Citations.] *Defendants' argument might have more force if only a single shot had been fired in the direction of where* [*the two primary victims*] *could be seen*."  (*Id*. at p. 564, italics added)  There is no inference derivable from *Vang* that firing five bullets into a crowd of people cannot result in the inference that the defendants intended that all of those people be killed.

Defendants assert that there was "no evidence of a group [they] intended . . .  [¶]  . . . being attacked . . . ."  They correctly point out that different witnesses gave different estimations of the number of people in the area at the time of the shooting.  However, it was for the jury to resolve this conflict and determine the number of people, if there was a kill zone and whether Bolden was in it.  Bolden testified that Pride grabbed him after

31

the first shot and the two began running.[23]  The fact that Pride began running after the first bullet was fired, contrary to defendants' assertion, did not somehow "undo" the kill zone and defendants cite no authority so holding.  We note that in *Bland*, the defendant fired a hail of bullets "at the fleeing [victim's] car." (*Bland*, *supra*, 28 Cal.4th at p. 331.)

Next, defendants criticize the language in the standardized instruction concerning the kill zone.  They assert that because it refers, *at one point*, to a "zone of harm" rather than a "zone of lethal harm" it permitted the jury to infer the intent to kill from Bolden being "within the zone of risk from [Windfield's] stray shots."  However, defendants take this singular reference out of context.  To repeat, the instruction provided, in pertinent part, "A person may intend to kill a particular victim or victims and at the same time *intend to kill everyone* in a particular zone of harm or '*kill zone*.'  In order to convict a defendant of the attempted murder of . . . Bolden, the People must prove that the defendant not only intended to kill . . . Pride but also . . . *intended to kill everyone within the kill zone*."  We disagree that this language invited the jury to infer the intent to kill based merely on Bolden's presence in a zone of non lethal harm.  (Accord, *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1396.)  Moreover, adding the word "lethal" would

_____

[23]  Although we acknowledge, as defendants point out, that in his pretrial statement to police, Bolden said that Pride began running before the first bullet had been fired, the jury could have relied on his trial testimony, which was that Pride did not begin running until the first bullet was fired.  Bolden also testified that after he began running, Pride was running in the same direction as Bolden, adding, "He did some zigzags*, and we broke off*."  Even if the jury credited Bolden's pretrial statement, that did not necessarily preclude a finding that there was a zone of danger and defendants cite no authority so holding.

32

do nothing to address defendants' concern about the zone of risk of what defendants' term Windfield's "stray shots."  Specifically, what is meant by the term "stray bullets" in the context of the kill zone theory?  Is a stray bullet one which is directed at the primary target, but comes closer to the attempted murder victim?  *Vang*, *supra*, 87 Cal.App.4th at page 564 illustrates our point.  Despite the defendant's assertion that most of the bullets were directed at the primary target, who was standing at the front door of his duplex unit, the appellate court concluded that there was substantial evidence to support an inference that the defendants intended to kill everyone in the household.  (*Id*. at pp. 558, 564.)  The same was true of the second home the defendants shot up—an apartment in which the primary target and two family members were sitting near the front window, yet two uninjured children in a bedroom were included within the collection of attempted murder victims, even though, no doubt, they were endangered by "stray" bullets.  (*Id*. at pp. 558, 564.)

Finally, it must be remembered that the jury found that the attempted murder of Bolden was willful, which required it to find that the defendants intended to kill him.  We disagree with defendants' assertion that this instruction permitted the jury to find that they willfully attempted to murder Bolden by intending only to kill Pride.

Nor does *Stone* require a different result.  In *Stone*, defendant fired at a group of 10 people.  (*Stone*, *supra*, 46 Cal.4th at p. 135.)  The information singled out one of those ten people as the alleged attempted murder victim.  (*Ibid*.)  However, that person testified that he did not think defendant pointed the gun at anyone in particular, it "had not been

33

pointed 'directly' at him, but it was 'near' him," and he believed it was fired just to scare him and the others in the group—that he "really d[id]n't think [defendant] was trying to shoot anybody.'" (*Ibid.*) Based on the evidence, the prosecutor conceded to the jury during argument that "he had not proven that defendant intended specifically to kill [the alleged attempted murder victim] rather than *someone* in the group of 10 persons. He argued, however, that an intent to kill someone, even if not specifically [the alleged attempted murder victim] was sufficient for the jury to find defendant guilty of the attempted murder . . . ." (*Id.* at p. 139.) The California Supreme Court concluded that "[The allegation] that defendant intended to kill [the alleged attempted murder victim] was problematic given that the prosecution ultimately could not prove that defendant targeted a specific person rather than simply someone within the group. . . . [I]t would have been sufficient to allege that defendant . . . attempted to murder a member of [the] group . . . ." (*Id.* at p. 141.)[24]

In contrast to the facts in *Stone*, more than one bullet was fired here, there was evidence to support a finding that Windfield fired at Bolden and the prosecutor did not concede that the evidence was insufficient to prove that the defendants intended specifically to kill Bolden—in fact, the prosecutor argued just the opposite.

---

[24] The holding in *Stone* was that "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind." (*Id.* at p. 140.)

2. *Sentencing*

a. *Minimum Period of Parole for Windfield's Attempted Murder Conviction*

As to each of the attempted murders, the sentencing court imposed 20 years for the section 12022.53, subdivisions (c) & (e)(1) enhancements, and as to the section 186.22, subdivision (b)(1)(C) enhancement, an additional term of 10 years was not imposed, but an increase in the minimum parole eligibility on the life term for the crimes (§ 664, subd. (a)) from 7 years (§ 3046, subd. (a)(1)) to 15 years was imposed pursuant to section 186.22, subdivision (b)(5). Under section 12022.53, subdivision (c), which was alleged and found to be true here, a 20-year enhancement is added where the defendant personally and intentionally discharged a firearm. Under section 12022.53, subdivision (e)(1), which was also alleged and found to be true here, the 20-year enhancement of subdivision (c) is to be imposed on any principal if a principal in the offense personally and intentionally discharged a firearm and the defendant violated section 186.22, subdivision (b). Specifically, the allegation in the Information was that "a principal personally and intentionally discharged a firearm . . . within the meaning of Penal Code section 12022.53(c) and (e)(1)" and the true finding was that "Windfield . . . personally and intentionally discharged a firearm" and "a principal personally and intentionally discharged a firearm" and that as to Windfield, the allegation and the true findings were that the crimes were committed to benefit a gang, pursuant to section 186.22, subdivision (b)(1)(C).

Windfield here contends that section 12022.53, subdivision (e)(2) prohibits the imposition of both the 20-year enhancement and the increasing of the minimum parole eligibility date, therefore, the latter is improper. That subdivision provides, "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." Windfield asserts that because the Information did not allege that *Windfield* had personally and intentionally discharged a firearm, section 12022.53, subdivision (e)(2) does not apply.

Subdivision (j) of section 12022.53 states, "For the penalties in this section to apply, *the existence of any fact* required under subdivision . . . (c) shall be alleged in the accusatory pleading and . . . found to be true by the trier of fact." (Italics added.) The information here did not allege that *Windfield* had personally and intentionally discharged a firearm, but it did allege that a principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), which provides for the 20-year enhancement for any person who in the commission of the offense personally and intentionally discharges a firearm. This was notice to defendant that the People intended to prove that someone who committed the attempted murders personally and intentionally discharged a firearm. Was there any notice or due process necessity to identify that person pre trial as Windfield? Windfield cites no authority so holding. The

prosecutor argued to the jury concerning the firearm allegations attached to the attempted murders, "As to . . . Windfield, his verdict forms will read that he personally discharged the weapon that night. . . . Based on the evidence in this case, we know that . . . Windfield personally did it, and that one of the principals, him, did it; so you find those gun allegations to be true." Counsel for Windfield objected neither to this argument, nor to the verdict form that specifically named his client as the principal who personally and intentionally discharged the firearm within the meaning of section 12022.53, subdivision (c), thus suggesting that he had notice that Windfield was that principal. Although Windfield attempts to use the fall-back argument that his trial attorney was incompetent for not objecting to the verdict form (he does not mention the prosecutor's argument, but the argument applies equally to it) had he objected, the prosecutor could have amended the information to make the specific allegation that Windfield personally and intentionally discharged the firearm and Windfield cites no authority holding that she could not have.

We disagree with Windfield that the situation here is like that in *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*). Therein, the sentencing court used a multiple victim circumstance that had not been alleged, "nor was its numerical subdivision . . . ever referenced in the pleadings" to sentence defendant to an alternative and harsher sentence for the crime even though an entirely different set of facts supporting such a sentence, which included defendant's use of a gun, had been alleged and found true by the jury. (*Id*. at pp. 730, 738-739, 741, 743.) In so doing, the

sentencing court relied on the gun use to impose enhancements rather than to justify the alternative and harsher sentence. (*Ibid.*) Noting that the provisions governing the alternative and harsher sentence scheme required that "'[f]or the penalties provided in this section to apply, the existence of any fact required . . . *shall be alleged in the accusatory pleading* and . . . found to be true by the trier of fact'" the California Supreme Court concluded that in the absence of an allegation that the crimes involved multiple victims, "[s]ubstitution of that unpleaded circumstance for the first time at sentencing as a basis for imposing the [alternative and harsher sentence] violated the explicit pleading [requirements] of [that provision]." (*Id.* at p. 743.) Additionally, since only the minimal number of circumstances triggering the alternative and harsher sentence had been alleged and proven, another part of the same provision required that those circumstances be used to impose that sentence and not to impose punishment under any other law. (*Id.* at pp. 743-744.) The People asserted that the additional circumstance of multiple victims, although not alleged and not found true by the jury, had, in fact, been alleged because the information contained counts involving two different victims, for which the jury found defendant guilty. (*Id.* at p. 744.) However, the High Court concluded that allowing this to serve as a basis for the existence of the multiple victim circumstances, while consistent with the requirement that "'*the existence of any fact* required . . . *shall be alleged in the . . . pleading,*'" was inconsistent with that requirement "when read in conjunction with [the requirement that] . . . [¶] . . . [i]f only the minimum number of circumstances . . . *have been pled and proved*, . . . th[ey] shall be used as the basis for

imposing the [alternative and harsher sentence]." (*Id*. at pp. 743-745, italics original and added.) Therein lies the most significant difference between *Mancebo* and this case. Section 12022.53 does not have a subdivision that is similar to the second one discussed in *Mancebo*. Additionally, as the Supreme Court pointed out in *Mancebo*, "[T]he information neither alleged multiple victim circumstances nor referenced [the portion of the provision containing them]. In other words, no factual allegation in the information . . . in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for [alternative and harsher] sentencing . . . . Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure [an alternative and harsher sentence] and use the circumstance of gun use to secure additional enhancements . . . ." (*Id*. at p. 745.)

Here, in contrast, the information contained the statutory language of section 12022.53, subdivision (c) and specifically referred to that section. Additionally, the prosecutor argued to the jury that Windfield was the principal who had intentionally and personally discharged the firearm and the jury was given a verdict form providing the same, which it signed. Thus, unlike *Mancebo*, it was long before sentencing that the possibility that Windfield could have his minimum parole eligibility date extended from 7 to 15 years because this was a gang crime and defendant intentionally and personally

discharged a firearm and he could receive a 20-year enhancement for his intentional and personal discharge of a gun was made known to him.

Equally unhelpful to Windfield is *People v. Botello* (2010) 183 Cal.App.4th 1014, in which the information contained no reference to section 12022.53, subdivision (e)(1) and the jury returned no true finding as to it (*id*. at p. 1021), both, unlike here. In *Botello*, the defendants, identical twins, successfully argued on appeal that there was insufficient evidence that either personally discharged a firearm because the eyewitness was unable to say which of the two fired the shots. (*Id*. at pp. 1017-1018, 1022) The appellate court then determined whether it could rely "for the first time on appeal" on section 12022.53, subdivision (e) in order to sustain the personal use firearm enhancements. (*Botello,* at p. 1022.) The People argued that the factual requirements of section 12022.53, subdivision (e) had been met even though it had not been alleged or specifically found true by the jury. (*Botello,* at p. 1022.) The appellate court concluded that under *Mancebo* and *People v. Arias* (2010) 182 Cal.App.4th 1009, that it could not. (*Botello*, at p. 1024.) *Botello* observed that *Mancebo* concluded that "the inadequacy of pleading identified by the [California] Supreme Court was not the failure to plead facts that would support the multiple-victim circumstance, but rather the failure to plead the circumstance itself." (*Botello*, at p. 1024.) *Botello* observed that *Arias* concluded that the allegation that an attempted murder was willful, premeditated and deliberate, which were not in the information, could not be used as a basis to impose the alternative and harsher sentence for the crime where, even though the trial court instructed the jury to determine if the

40

crime was accompanied by those mental states, the jury returned only a verdict of first degree attempted murder. (*Id*. at p. 1026.) The *Botello* court held, "Like the [provisions] in *Mancebo* and . . . in *Arias*, section 12022.53, subdivision (e)(1), has a specific pleading and proof requirement[.] . . . [¶] Also as in *Mancebo* and *Arias*, there was a failure to comply with the pleading requirement. . . . Here, the information . . . did not mention the applicability of th[e] enhancements [alleged] through subdivision (e)(1), either by designation of that provision or by description of the required circumstances . . . ." (*Id*. at pp. 1026-1027.) As we have already stated, here, there was both a reference in the information to section 12022.53, subdivision (e) and use of its precise language.

      b. *Cruel and Unusual Punishment*

Windfield was sentenced in another case to three 25 years to life terms, plus a life term with a 15 year minimum which was run concurrently with the time imposed in this case. Windfield contends that this sentence violates *Miller v. Alabama* (2012) 567 U.S.___ [132 S.Ct. 2455] (*Miller*).

Windfield was 18 years old when he committed the crimes in both cases and 21 when he was sentenced for both. He points out that his minimum parole eligibility extends beyond any life expectancy he could possibly have. In *Miller*, the United States Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller*, *supra*, 567 U.S. ___ [132 S.Ct. at p. 2460].) The High Court noted, "Because juveniles have diminished culpability and greater prospects for

41

reform, . . . 'they are less deserving of the most severe punishments.' [Citation.] . . . [C]hildren have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] . . . [They] 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] . . . [A] child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [Citation.] [¶] . . . [¶] . . . [T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because "'[t]he heart of the retribution rationale'" relates to an offender's blameworthiness, "'the case for retribution is not as strong with a minor as with an adult." [Citations.] Nor can deterrence do the work in this context, because "'the same characteristics that render juveniles less culpable than adults'"—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. [Citations.] Similarly, incapacitation could not support the life-without-parole sentence . . . . Deciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'—but "'incorrigibility is inconsistent with youth.'" [Citations.] And for the same reason, rehabilitation could not justify that sentence. Life without parole 'forswears the rehabilitative ideal.' [Citation.] It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at

odds with a child's capacity for change. [Citation.] [¶] . . . [¶] . . . [T]he characteristics of youth and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. [Citation.] . . . '[C]riminal procedure laws that fail to take defendants' youthfulness into account would be flawed.' [Citation.] . . . [¶] [T]he mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionally punishes a juvenile offender. . . . [¶] . . . Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.' [Citation.] . . . [¶] . . . [¶] . . . Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself . . . . It neglects the circumstances of the homicide . . . , including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetency's associated with youth—for example, his inability to deal with police officers or prosecutors . . . or his incapacity to assist his own attorneys. [Citations.] And finally, mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

43

[¶] . . . [¶] . . . [O]ur decision . . . mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Id*. at ____, ____, ___ [132 S.Ct. 2464, 2465, 2466, 2468, 2471])

Defendant contends that scientific literature shows that the features of juveniles discussed in *Miller* extend to 18 year olds. However, we are bound by precedent and there is no precedent for us to declare that *Miller* applies to 18 year olds. Our legislature has determined that 18 is the age at which a person is considered an adult. (*People v. Gamache* (2010) 48 Cal.4th 347, 405.)

In *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482, the appellate court rejected an identical argument, holding, "while '[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.] Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [that the defendant's] sentence is not cruel and/or unusual under *Graham* [*v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011]], *Miller* [*v. Alabama* (2012) 567 U.S. ___[132 S.Ct. 2455]], or [*People v.*] *Caballero* [(2012) 55 Cal.4th 262]."

### III.

### DISPOSITION

The trial court is directed to amend the abstract of judgment for Canizales by omitting the "S" next to each of the section 186.22, subdivision (b)(1)(C) enhancements. The trial court is directed to amend the abstract of judgment for Windfield by checking the box next to "7", and completing a determinate abstract of judgment which shows the 20-year term imposed for each of the section 12022.53, subdivision (c) enhancements on the two attempted murder. In all other respects the judgments are affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

CODRINGTON
J.

45